**In the United States District Court
for the District of Kansas**

———————

Case No. 20-cv-01162-TC-GEB

———————

JACOB JOHNSON, ET AL.,

*Plaintiffs*

v.

UNIFIED SCHOOL DISTRICT 507, HASKELL COUNTY, KANSAS,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Plaintiffs Jacob "JD" Johnson and Rachel Johnson filed this action against their former employer, Defendant Unified School District No. 507, Haskell County, Kansas, alleging that their terminations violated the First Amendment, federal statutory law, Kansas common law, and their employment contracts. Doc. 37. The School District moved for judgment on the pleadings. Doc. 40. For the following reasons, the School District's motion is granted in part and denied in part.

**I**

**A**

Having filed its answer to Plaintiffs' Second Amended Complaint, the School District moves for judgment on the pleadings under Fed. R. Civ. P. 12(c). Rule 12(c) motions are appropriate "[a]fter the pleadings are closed," which means "upon the filing of a complaint and answer." *Progressive Cas. Ins. Co. v. Estate of Crone*, 894 F. Supp. 383, 385 (D. Kan. 1995); *see* 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1367 (3d ed. 2021).

The standards applicable to Rule 12(b)(6) and 12(c) motions are the same. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). To survive a motion to dismiss, the complaint

1

need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Tenth Circuit has summarized two "working principles" that underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, the Court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Kan. Penn Gaming*, 656 F.3d at 1214. Second, the Court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts, viewed in the light most favorable to the claimant, must move the claim from merely conceivable to actually plausible. *Id.* at 678–80. The "mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

**B**

In 2017, the School District hired Rachel as a social studies teacher at Satanta Junior/Senior High School. Although JD[1] had previously worked at the high school too, in 2018 he became the principal of Satanta Elementary School. 37 at ¶¶ 11, 21. The Johnson's daughter, G.J., was a student at the Junior/Senior High School. *Id.* at ¶ 23.

---

[1] To avoid any confusion, this Memorandum and Order will refer to Plaintiff JD Johnson as "JD" and Plaintiff Rachel Johnson as "Rachel."

On October 16, 2018, G.J. reported to a teacher that three male students had sexually assaulted her. She was ultimately directed to the school resource officer. The school resource officer obtained surveillance video of the assault and notified law enforcement. Doc. 37 at ¶¶ at 27–29. When law enforcement asked, JD said that he wanted to press charges. *Id.* at ¶ 30. The Haskell County Attorney's office, after reviewing the evidence, filed charges against the three students for aggravated indecent liberties with a child, conspiracy to commit aggravated indecent liberties, and kidnapping. *Id.* at ¶ 31.

Plaintiffs contend that the School District allowed students to display posters of support for the three male students and failed to protect G.J. from harassment. Doc. 37 at ¶¶ 32–34. As a result, Rachel, who was already at the school teaching, began to escort G.J. to class. *Id.* at ¶ 35. Plaintiffs allege that on October 18, 2018, Principal Stegman at Satanta Junior/Senior High School told G.J. that she was a burden on the school district and suggested that she should "put herself in the shoes of the three young men who assaulted her." *Id.* at ¶ 36.

Six days after G.J.'s assault, USD 507's superintendent, Mike Ward, called JD and Rachel to a meeting set for early the next morning. Doc. 37 at ¶ 37. At that meeting, Ward tried to discredit G.J.'s sexual assault allegation, accused JD and Rachel of creating a toxic work environment, and placed the two on indefinite paid leave. *Id.* at ¶ 38. Ward also accused them of "abusing their authority" by initiating criminal proceedings against the three male students. *Id.* at ¶ 40. Thereafter, Ward spread rumors of the pair's infidelity and sought written statements from anyone who would provide derogatory information about the Johnsons. *Id.* at ¶¶ 43, 45–46.

In February 2019, the School District's board passed resolutions that terminated both JD and Rachel. Doc. 37 at ¶ 47. Ward participated in the executive discussions leading to the terminations. *Id.* at ¶ 48. Another board member who participated in that meeting and signed the termination resolutions was Sandra Rubio—the mother of one of the alleged assailants. Doc. 41-1 at 2; Doc. 41-1 at 6–7.

The School District justified the terminations on various grounds. For JD, the School District claimed that he fabricated several statements about inappropriate student behavior, impermissibly provided the video of G.J.'s assault to law enforcement instead of keeping it in-house for the School District's own investigation, and failed to refer a student discipline matter to school authorities by instead referring it to

3

law enforcement. Doc. 37 at ¶ 50. As to Rachel, the School District claimed that it terminated her for fabricating statements about inappropriate student behavior, "fail[ing] to follow discipline reporting and investigation procedures to ensure the rights of all students were protected," and involving herself as a teacher in disciplinary issues that affected her family instead of referring them to the appropriate administrator. *Id.* at ¶ 51. The termination notices for both JD and Rachel also listed several other justifications. Examples include that JD "[f]ail[ed] to implement culturally sensitive programs and supports," Doc. 41-1 at 3, and that Rachel made "[c]ondescending and negative comments about minority students and staff members." *Id.* at 6.

According to the Johnsons, these allegations are indicative of retaliatory animus. Less than a year before the sexual assault, both JD and Rachel received favorable reports and recommendations from Ward. *See* Docs. 37-4 & 37-3. In fact, Ward's November 2017 performance evaluation rated Rachel as "proficient" in nearly every category and commented that "Mrs. Johnson is a valuable asset to the team at USD 507. She is honest, trustworthy, dependable, and carries herself in a professional manner. I commend her work ethic." Doc. 37-3 at 11. The comments in JD's January 2018 evaluation strike a similar tone: "Mr. Johnson has proven to be well on his way to being an effective leader. He is honest, trustworthy, and dependable. He leads by example. He does not shy away from leadership in tough times. I commend his ability to take tasks head on. He is a great team player. Well done Mr. Johnson." Doc. 37-4 at 15.

The Johnsons sued the School District, asserting four counts: (i) unlawful retaliation in violation of Title IX, 20 U.S.C. § 1681; (ii) unlawful retaliation[2] in violation of the First Amendment; (iii) breach of Plaintiffs' respective employment contracts; and (iv) the state-law tort of retaliatory discharge. On its motion for judgment on the pleadings, the School District argues that the Johnsons failed to state a claim for Title IX retaliation, First Amendment retaliation, and retaliatory

---

[2] Though the Johnsons do not identify a specific cause of action for the alleged First Amendment violation, Doc. 37 at ¶¶ 60–66, the Second Amended Complaint states a claim for relief under 42 U.S.C. § 1983. *See Worrell v. Henry*, 219 F.3d 1197, 1213–14 (10th Cir. 2000). "[N]o heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

4

discharge in violation of Kansas public policy. Doc. 41 at 2. The School District did not seek judgment on the breach of contract claim. *Id.* at 21.

## II

The School District's motion is granted in part and denied in part. Specifically, the Second Amended Complaint states a valid claim for relief under both Title IX and the First Amendment. But Kansas's alternative remedies doctrine precludes Plaintiffs' state-law retaliatory discharge claim.

### A

The Johnsons assert a claim for Title IX retaliation. In particular, they contend that the School District retaliated against them based on their daughter's sexual assault report and the support that they provided to her. Doc. 37 at ¶¶ 54–59.

Title IX prohibits discrimination "on the basis of sex" in educational programs or activities receiving federal funding. 20 U.S.C. § 1681(a). Its protections extend to those who suffer retaliation because of a complaint about sex discrimination, whether the complainant is the victim, *see Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1311 (10th Cir. 2020), or an advocate for the victim, *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005). To state a claim for Title IX retaliation, a plaintiff must show that the plaintiff engaged in protected activity, the employer took an adverse employment action against the plaintiff, and the employer took its adverse action because of the plaintiff's protected activity. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 (10th Cir. 2017); *Robinson v. Wichita State Univ.*, No. 16-2138, 2018 WL 836294, at *3 (D. Kan. Feb. 13, 2018).

The Second Amended Complaint plausibly alleges that the School District retaliated against the Johnsons in violation of Title IX. It alleges that the sexual assault deprived their daughter of educational opportunities, that the Johnsons advocated for her Title IX rights both within the school setting and outside it by communicating with prosecutors, and that the School District terminated Plaintiffs based in large part on that advocacy. Doc. 37 at ¶¶ 30–51. That is sufficient. *See Sch. Dist. No. 1*, 970 F.3d at 1310–11 (applying *Jackson*, 544 U.S. at 173–74).

The School District presents two arguments as to why the Johnsons fail to state a claim for Title IX retaliation. First, it argues that there was no retaliation because the precipitating event—G.J.'s alleged sexual assault—cannot and does not implicate Title IX, reasoning that Title IX addresses only intentional conduct by a funding recipient and that "a single instance of student-on-student sexual assault" does not constitute intentional conduct by the School District. Doc. 41 at 7. Second, the School District argues that the Johnsons failed to adequately allege that Rachel engaged in any protected activity. *Id.* at 9. Both arguments fail as a matter of law.

The first argument misunderstands the Johnsons' claims. The Johnsons are not alleging that they (or their daughter) were the victims of a direct violation of Title IX. Had they done so, it would have been incumbent on them to establish that the School District intentionally caused G.J. to experience sex discrimination, either through the discriminatory conduct of its own agents or by deliberate indifference to sexual misconduct of other students. *See Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1103 (10th Cir. 2019). As the School District notes, establishing such deliberate indifference with a single incident of student-on-student sexual violence is difficult. Doc. 41 at 8 (citing, among others, *Kollaritsch v. Mich. St. Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019)).

Instead, the Johnsons assert that they suffered *retaliation* because they advocated for G.J.'s Title IX rights following an assault. Unlike with direct violations, where liability for student-on-student misconduct depends on deliberate indifference to known harassment, retaliatory conduct will itself suffice to establish that a defendant acted intentionally. *See Jackson*, 544 U.S. at 173–74 (noting that retaliation is, by definition, an intentional act in response to a report). Implicit in the School District's argument is that the Johnsons would only have a viable retaliation claim if they establish that G.J. has a valid underlying Title IX claim. Yet it offers no support for such an assertion. And, in related contexts, the Tenth Circuit has rejected that argument when the complaining party has a good-faith basis to believe that he or she is opposing conduct that federal law forbids. *See Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (citing *Crumpacker v. Kan. Dep't of Hum. Res.*, 338 F.3d 1163, 1172 n.5 (10th Cir. 2003)). The Second Amended Complaint plausibly alleges that the Johnsons were opposing conduct that they reasonably believed violated Title IX.

The School District's second argument—that the Johnsons did not adequately allege that Rachel took protected action—also fails.

6

Specifically, the Second Amended Complaint alleges that Rachel began escorting G.J. to class due to the School District's refusal to protect her from ongoing harassment that she believed was not sufficiently addressed. Doc. 37 at ¶¶ 33–37. That is sufficient to allege protected action. *See Jackson*, 544 U.S. at 180.

And there is more. The Second Amended Complaint also alleges facts to suggest that the School District considered the Johnsons and their daughter as a single source of trouble and took steps to harm them as a family after the sexual assault occurred. Even if Rachel had not individually engaged in protected activity, the School District still could not have terminated her simply because of the protected conduct of G.J. or JD. *Cf. Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (recognizing that retaliatory actions against one spouse for the other spouse's conduct is prohibited employer behavior).

**B**

The Johnsons also assert that they were terminated in retaliation for engaging in conduct protected by the First Amendment. Specifically, they contend that the School District retaliated against them for asking law enforcement to pursue charges. Doc. 37 at ¶¶ 63–65.

The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. Although "public employees do not surrender all their First Amendment rights by reason of their employment," their rights are more circumscribed, *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), and governmental employers have an important interest in maintaining an efficient workplace, *see id.* (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)); *see also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 599 (2008) (recognizing a government acting as an employer has greater leeway to manage employee conduct than to proscribe conduct for citizens at large).

To balance these competing interests, *Garcetti* and *Pickering* identified five considerations that illuminate the line between permissible employee management and improper stifling of private speech. *See Butler v. Bd. of Cty. Comm'rs*, 920 F.3d 651, 655 (10th Cir. 2019). The *Garcetti/Pickering* test asks whether: (i) the speech was made pursuant to an employee's official duties; (ii) the speech was on a matter of public concern; (iii) the government's interests, as an employer, in promoting

7

the efficiency of its public services are sufficient to outweigh the employee/citizen's free speech interests; (iv) the protected speech was a motivating factor in the adverse employment action; and (v) the employer would have reached the same employment decision in the absence of the protected conduct. *Id.* (quoting *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1181 (10th Cir. 2018)). The first three elements contain questions of law for the court, while the remaining two prongs are questions of fact for the jury. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).

The School District argues that it is entitled to judgment as a matter of law because the Johnsons cannot satisfy those first three aspects of the test. First, it argues that the Johnsons' expressive conduct was undertaken in their official capacities as principal and teacher. Doc. 41 at 11–15. Second, it argues that their expressive conduct involved a matter of private, internal concern rather than public. *Id.* at 16–17. Third, the School District contends that its interests in operating a public school outweighed the Johnsons' interest in expressing their concerns. *Id.* at 17–18. Each argument fails as a matter of law.

**1.** The first prong of *Garcetti/Pickering* asks whether "the employee spoke 'pursuant to [his] official duties.'" *Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008) (alteration in original) (quoting *Garcetti*, 547 U.S. at 421). Courts take "a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422). Applying this "practical view," the allegations in the Second Amended Complaint establish that the Johnsons' conduct was not undertaken pursuant to their official duties. The Johnsons allege that, after a preliminary investigation, law enforcement asked whether JD, as G.J.'s father, wished for charges to be filed against those allegedly responsible for assaulting his daughter. He did. As a result, the Haskell County Attorney's office conducted its own review of the evidence and then filed charges. Doc. 37 at ¶ 31.

There are no allegations to suggest that law enforcement sought JD's position on charges for a crime that occurred at the junior/senior high school because of his role as the elementary school principal. *Contra* Doc. 41 at 14. Nor are there any allegations to suggest that the School District tasked JD with making districtwide prosecutorial decisions for any of the School District's facilities. To the contrary, the reasonable inference is that law enforcement asked JD because the victim was his child and not because he was a principal. Similarly,

8

although Rachel actually worked in the high school and monitored and disciplined students as part of her duties, there is nothing in the record to suggest that—as a teacher—she had the power to direct law enforcement activities at the school. *Id.*

The School District argues that the Johnsons should have followed internal disciplinary procedures because student discipline was a major part of their role as educators. Doc. 41 at 14. While student discipline may be part of the job, it is irrelevant to the claims here. The Johnsons are not claiming that they wanted the school or the district to discipline students in a particular way and were punished for expressing those beliefs. Rather, they assert that the School District punished them for cooperating with an ongoing, external law enforcement investigation and for seeking redress in the courts—a core First Amendment right. This is not the type of activity that JD or Rachel were "paid to do." *See Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007); *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1329–30 (10th Cir. 2007) (finding superintendent spoke as a government employee and not a private citizen when she instructed a subordinate to contact federal authorities about potential illegality).

The School District further argues that, even if the Johnsons' were acting in their parental capacity, they were not *solely* acting in that mode. In other words, the School District claims that the Johnsons' conduct "was so intertwined with their job duties" as to preclude protection under the First Amendment. Doc. 41 at 14 (citing *Barone v. City of Springfield*, 902 F.3d 1091, 1101 (9th Cir. 2018); *Decotiis v. Whittemore*, 635 F.3d 22, 33 n.12 (1st Cir. 2011)). But this "inextricable intertwinement" argument does not warrant judgment at this stage. Unlike *Barone* and *Decotiis*, this case does not involve employees interjecting private opinions into speech that their employer had otherwise instructed, authorized, and paid them to make. *See Barone*, 902 F.3d at 1100 (holding Thelma Barone spoke as a public employee when answering questions at a work event titled "Come Meet Thelma Barone from the Springfield Police Department"); *Decotiis*, 635 F.3d at 32–33 (attempting to ascertain whether school therapist made her speech during client therapy sessions). As to JD, none of his actions fell within his duties as principal of a *different* school. *Cf. Green*, 472 F.3d at 801. He simply answered a question about charges when law enforcement asked. And as to Rachel, the Johnsons have pled sufficient facts to show that she escorted her daughter to class as any parent might have done in similar circumstances. While a teacher might also escort a bullied student

9

through school halls, the record at this Rule 12 stage does not support finding, as a matter of law, that only a teacher would do so or that doing so would be a teacher's job duty. Taking the complaint's facts as true and drawing all reasonable inferences in Rachel's favor, the intertwinement argument fails. *See Decotiis*, 635 F.3d at 33.

**2.** *Garcetti/Pickering*'s second prong considers whether the speech was on a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotations omitted). Thus, whether speech is on a public or private matter "turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

Generally, the pursuit of criminal charges or allegations of serious misconduct are matters of public interest and concern. *See Bailey*, 896 F.3d at 1181 (holding that letters or statements at sentencing proceedings pertain to a matter of public concern); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("[C]ommission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, … are without question events of legitimate concern to the public …"). For example, the Second Circuit has recognized that allegations of student-on-student sexual assault on public school property during school hours is a matter of public concern. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 164 (2d Cir. 2006). The protected activity identified in the Second Amended Complaint satisfies the public-concern element. The School District argues that JD's disclosures to law enforcement and his requests for prosecution did not relate to a matter of public concern because the matter did not involve official impropriety or corruption. Doc. 41 at 16. That argument fails for two reasons. First, it fails to account for the allegation that it was the school resource officer—not the Johnsons—who notified law enforcement about the alleged assault. Doc. 37 at ¶ 29. Following the school resource officer's disclosure, law enforcement asked JD whether the Johnsons wished to pursue criminal charges. Doc. 37 at ¶ 30. JD gave his assent in response to a legitimate law-enforcement inquiry that he did not initiate. Doc. 37 at ¶ 31; *id.* at ¶ 40.

The second reason that the argument fails is that the School District misreads the law. The School District cites *Butler*, 920 F.3d at 656, which does not purport to limit issues of public concern to only those

involving official impropriety or corruption. Instead, the court in *Butler* offered official impropriety as but one of a nonexhaustive list of matters that can constitute a public concern. *Id.* JD made his statements to law enforcement in an effort to allow a prosecution to proceed—something firmly in the realm of public concern. *Cox*, 420 U.S. at 492; *Cioffi*, 444 F.3d at 164 (holding student-on-student assault on school grounds is a matter of public concern); *see also Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1117 (8th Cir. 1997) (deeming criticism of a school's child abuse policy a matter of public concern); *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) (determining that the quality of education in school is a matter of public concern).

**3.** Finally, the third prong requires a determination of "whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests." *Dixon*, 553 F.3d at 1302. The employer ultimately bears the burden of showing that restriction of the employee's speech is necessary to provide efficient public service. *Bailey*, 896 F.3d at 1183. This analysis considers whether the speech at issue "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or … interferes with the regular operation of the enterprise." *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). That balancing test is especially difficult at the Rule 12 stage, given the manner in which a complaint's facts must be viewed.

Based on the allegations in the Second Amended Complaint, it does not appear that the School District's interest in efficiency outweighed, as a matter of law, the Johnsons' interest in prosecuting those responsible for sexually assaulting their daughter. First, the Johnsons' allegations—construed in their favor—indicate that their conduct occurred in their personal capacity, not in their roles as principal and teacher. *See supra* Part II.B.1. Second, in balancing the interests of efficient public service and individual free speech, courts give greater weight to speech about matters of public concern. *See Lane*, 573 U.S. at 241; *Thomas v. City of Blanchard*, 548 F.3d 1317, 1327 (10th Cir. 2008). The Johnsons' conduct involved a matter of public concern, not an internal grievance. *See supra* Part II.B.2. Moreover, the School District fails to identify any legitimate interest that its actions would advance.

The School District's contrary argument does not justify a different result. Specifically, it contends that the Johnsons' speech and conduct led to disharmony and protests within the school and surrounding

11

community and that the School District's acts were merely an effort to quell public discord. Doc. 41 at 13–15. But drawing all reasonable inferences in Plaintiffs' favor, one may conclude that silencing those advocating for a sexual assault victim—not efficient operation of a public school—was the interest that the School District sought to advance. Doc. 37 at ¶ 36 (telling the victim she was "burdening" the school and asking her to "put herself in the shoes" of the perpetrators); *id.* at ¶ 38 (blaming victim's parents for creating a toxic situation); *id.* at ¶ 39 (threatening victim's parents with arrest if they spoke to students or school employees); *id.* at ¶ 40 (accusing victim's parents of abusing their authority for authorizing criminal prosecution of their child's assailants); *id.* at ¶ 43 (soliciting written statements from anyone who could provide derogatory information about victim's family); *id.* at ¶¶ 45–46 (spreading false rumors that victim's parents were each involved in sexual affairs). In sum, the facts pled plausibly suggest that what the School District did was not in the interest of promoting internal harmony or efficient government service. Thus, the third prong of the *Garcetti/Pickering* test is met.

## C

In addition to alleging that the School District terminated them in retaliation for exercising their First Amendment right to free speech, the Johnsons also assert a claim for retaliatory discharge under Kansas law. Doc. 37 at ¶ 81. That state-law claim is precluded because it duplicates the federal claims.

In Kansas, the alternative remedies doctrine is a "substitution of law concept." *Flenker v. Willamette Indus., Inc.*, 967 P.2d 295, 299 (Kan. 1998). Under this doctrine, "a state or federal statute would be substituted for a state retaliation claim if the substituted statute provides an alternative remedy." *Id.* To substitute a statutory claim for the common-law tort of retaliatory discharge, the statutory remedy must be actually available and adequate. *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 444 (Kan. 2004).

That doctrine precludes the Johnson's retaliatory discharge claim because their First Amendment claim provides an adequate alternative remedy via Section 1983. *See Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1160–61 (10th Cir. 2015). The Section 1983 and retaliatory discharge claims rely on exactly the same set of facts, *see* Doc. 37 at ¶¶ 63–65, 78–80; the relief sought is exactly the same, *see* Doc. 37 at ¶ 85; and the Tenth Circuit, interpreting Kansas law, has held that

12

Section 1983 provides an adequate remedy such that a duplicative common-law retaliatory discharge claim may not proceed. *Seifert*, 779 F.3d at 1160.

The Johnsons contend that Kansas public policy requires protection of sexual assault reporting, Doc. 45 at 23, and that there are "substantial public policy differences between the First Amendment, Title IX, and the Kansas public policy protecting children from abuse." Doc. 45 at 27. But differences among the underlying policy rationales matter not; the issue under Kansas law is whether the Johnsons have an adequate alternative remedy. *Campbell v. Husky Hogs, LLC*, 255 P.3d 1, 8 (Kan. 2011). As to their retaliatory discharge claim, they do. *See Worrell v. Henry*, 219 F.3d 1197, 1213–14 (10th Cir. 2000) (analyzing First Amendment retaliation claims under § 1983); *Flenker*, 967 P.2d 295, 299 (Kan. 1998).

### III

The Defendant's Motion for Judgment on the Pleadings (Doc. 40) is GRANTED in part and DENIED in part.

It is so ordered.

Date:  January 20, 2022               s/ Toby Crouse

                                                   Toby Crouse
                                                   United States District Judge